**ANSALDO COMPONENTI,
S.p.A., Plaintiff,**

**v.**

**UNITED STATES, Defendant,**

**Westinghouse Electric Corporation,
Defendant-Intervenor.**

**Court No. 84–9–01234.**

United States Court of
International Trade.

Jan. 17, 1986.

Coudert Brothers (Sherman E. Katz, Robert A. Lipstein, Deborah A. Lewis), Washington, D.C., for plaintiff.

Richard K. Willard, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch (Platte B. Moring, III), Gaylin Soponis, U.S. Dept. of Commerce, Washington, D.C., for defendant.

Steptoe & Johnson (Richard O. Cunningham, W. George Grandison, Kevin J. Brosch and Barbara A. Pollack), Washington, D.C., for defendant-intervenor.

FORD, Senior Judge:

This action contests the final results of administrative review of an antidumping finding involving *Large Power Transformers from Italy* (49 Fed.Reg. 31313, August 6, 1984), conducted by the U.S. Department of Commerce, International Trade Administration (ITA), pursuant to section 751(a) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1675(a). Before the Court is plaintiff's (Ansaldo) motion, under Rule 56.-1, for Judgment Upon Agency Record. Defendant and intervenor (Westinghouse) oppose said motion and seek affirmance of the administrative review under challenge. Jurisdiction is pursuant to 19 U.S.C. § 1516a and 28 U.S.C. § 1581(c).

A review of the extensive background of this matter is essential to its disposition and warranted under the circumstances presented in this case. In 1970, Westinghouse filed an antidumping complaint with the Department of Treasury[1] alleging that large power transformers from six countries were being sold in the United States at less than fair value and that a U.S. industry was being injured by those sales. The class or kind of merchandise was defined as all large power transformers rated 10 MVA or above, classified under items 682.0755, 682.0765 and 682.0775 of the Tariff Schedules of the United States. After conducting an investigation, the Department of Treasury found that large power transformers from Italy were being sold at less than fair value and ordered antidumping duties assessed against such entries. 37 Fed.Reg. 11772 (June 14, 1972). Among the companies affected by the dumping order was ASGEN, an Italian manufacturer and corporate predecessor of plaintiff Ansaldo.

In the early 1970's the transformer manufacturing assets of ASGEN were merged into Italtrafo, S.p.A. On July 1, 1976, the Customs Service sent a letter to Italtrafo requesting specific information on all transformers shipped to the United States after October 22, 1971, and for all home market and third country transformers for which it had accepted orders during the time period covered by dates of purchase of the United States units. On April 1, 1977, Italtrafo reported it had concluded only one contract with a United States customer since 1972, a 1973 order placed by Bonneville Power Administration (BPA I), and stated that records on identical or similar units ordered by third countries or by domestic customers could not be located. As a result, the

---

1. Prior to the enactment of the Trade Agreements Act of 1979, the Department of Treasury had responsibility for the administration of U.S. antidumping duty laws.

Customs Service requested that Italtrafo supply information to enable it to appraise BPA I on the basis of constructed value.

On March 12, 1979, the U.S. Embassy in Rome notified the Customs Service of two Italtrafo transformer sales in 1974 to an importer in Puerto Rico. The Customs Service proceeded to request all pertinent information from Italtrafo during the period covering the Puerto Rican sales. Concurrent with this inquiry, the Customs Service determined that, as other Italtrafo transformers had been sold in Italy and to third countries, constructed value would not be an appropriate basis for appraisal of the U.S. entries. On November 15, 1979, Italtrafo provided information on the two 1974 sales in Puerto Rico and three home market sales.

Following the transfer of authority for administering the antidumping laws from the Treasury Department, the Commerce Department, in March, 1980, initiated a section 751(a) review of Large Power Transformers from Italy. On August 13, 1980, Commerce sent Italtrafo an antidumping questionnaire covering the period September 1, 1977 through June 30, 1980. A reply was requested within thirty days, and Italtrafo was cautioned that any undue delays or lack of response could result in the agency's proceeding on the basis of best information available.

On April 14, 1981, counsel for Italtrafo entered a notice of appearance in connection with the administrative review and informed Commerce that Italtrafo had become a division of Ansaldo, S.p.A. On May 19, 1981, more than nine months after the initial request for information by Commerce, counsel for Ansaldo submitted information concerning the 1973 BPA I sale and certain third country sales in 1973–74. No information or data on home market sales was contained in the submission. Ansaldo maintained it made no home market sales to unrelated purchasers within the meaning of 19 C.F.R. § 353.22(b) since all home market customers were related to Ansaldo through a complex chain of government ownership. Instead, Ansaldo argued the review should proceed on the basis of third country sales. A subsequent submission provided a list of Ansaldo's home market and third country customers for the 1972–74 period, but contained no price information and offered no explanation of the relationship between Ansaldo and its home market customers.

On July 1, 1981, Commerce requested information from Ansaldo for the period July 1, 1980 to May 31, 1981, including information on shipments entered before these dates if not previously supplied, and requested a response within thirty days. Three months later, on October 5, 1981, Ansaldo reported it had made no U.S. sales during the period covered by the questionnaire and provided no home market information.

Commerce published a notice of preliminary results of administrative review on April 13, 1982. This notice covered the period from May 2, 1974 through June 10, 1980. The notice stated the ITA was postponing appraisement pending receipt of additional information from Ansaldo. In written comments to the preliminary results, submitted on May 12, 1982, Ansaldo asserted that "the Department has had since June 9, 1981, a complete listing of *all* Ansaldo/Italtrafo sales of *all* markets, *home* and export, for the period of time the Department deemed relevant."

On June 17, 1982, Commerce requested information from Ansaldo for the period June 1, 1981 to May 31, 1982. Again, Commerce sought information on shipments entered before these dates if not furnished in a previous response. Similarly, the questionnaire requested a reply within 30 days and cautioned that undue delay or insufficient response could result in the agency's use of the best information available. On September 22, 1982, Ansaldo, as in the preceding review, reported no sales for the period covered by the questionnaire.

Ansaldo was notified, on September 15, 1982, that the ITA had not resolved the issue of whether home-market sales or third country sales would be used to deter-

mine foreign value. Ansaldo was requested to submit further data on home market sales, even if the sales were between related parties. In response, Ansaldo argued that all its home-market sales were to related parties. Ansaldo contended the only comparable transformer sales were of units with a rating of 100 MVA or higher, and that all home market sales in this category were to related parties. Ansaldo did submit data for home-market sales for the 1972–74 period, but limited its submission to the category of sales it deemed comparable.

On February 25, 1983, Commerce advised Ansaldo its response had been inadequate insofar as it related to data on all transformers with a rating of 10 MVA or above. In addition Ansaldo should have provided sales information for the periods subsequent to 1974. Ansaldo, on March 11, 1983, submitted a list of home-market sales for the period 1975–79, but the listing did not include the price information necessary for Commerce to analyze price comparability. The ITA casehandler notified Ansaldo, on March 15, 1983, that its submission was deficient and Commerce was proceeding on the basis of best information available.

Twice thereafter, on April 8 and again on April 22, 1983, Commerce requested more detailed information on specific home-market sales from Ansaldo. A deadline of May 9, 1983 was extended to July 8, 1983. In the interim, Commerce announced it had established a procedure for selecting home-market units for comparison with units sold to the United States.

Ansaldo's reply to Commerce on July 7, 1983, stated, in part:

> As the information requested ... cannot legally serve as a basis for the Department's administrative review, requiring that such information be developed by Ansaldo and provided to the Department would impose an unreasonable and unnecessary burden on the company.

Commerce continued to obtain information concerning U.S. imports of transformers sold by Ansaldo from both the Customs Service and Westinghouse. At the same time, Commerce commenced a large-scale study to refine its methodology for use in analyzing U.S. price and foreign market value in all the administrative reviews of large power transformers. The ITA wrote letters, received briefs, and conducted hearings involving all the parties in the transformer proceedings. After analysis of the information received, Commerce, on December 14, 1983, announced the methodology it would use for its determinations and initiated a revised preliminary review of transformers sold by Ansaldo.

By letter dated December 12, 1983, Commerce indicated to Ansaldo its intention to review the four Ansaldo/Italtrafo sales to the United States: BPA I, the two sales in Puerto Rico, and another sale to the Bonneville Power Administration in 1979, BPA II. The agency outlined the information it had received on the first three sales and noted it had received no information on the 1979 BPA II transformer sale. Specific information was requested for a number of Ansaldo home market sales deemed similar to the U.S. sales, and Ansaldo was invited to submit information on other sales it deemed comparable. The ITA had decided that sales between Italtrafo and its customers in the home market were sales between unrelated parties in light of the relationship between them. Ansaldo was asked to provide the requested information no later than December 30, 1983, and cautioned that:

> We will not accept partial submissions and failure to provide ... complete information may result in our not using other information submitted.

On January 10, 1984, counsel for Ansaldo requested a two-month extension of time to prepare a response to the Commerce letter of December 12, 1983. The ITA reply to this request indicated the information was past due and that failure to submit the information by January 27, 1984, would result in Commerce using the best information otherwise available to complete the review.

The information sought from Ansaldo was not provided by the January 27, 1984

deadline. On March 9, 1984, Commerce supplied Ansaldo with an advance copy of the Federal Register notice to be published March 16, 1984. The notice stated:

Italtrafo failed to provide an adequate response to requests for information. For this firm the Department used the best information available to determine the assessment and estimated antidumping duties cash deposit rates.

A disclosure conference was held on March 19, 1984, at the request of counsel for Ansaldo. At that meeting, the ITA explained the best information available was derived from three sources: 1) information obtained during the Treasury Department's fair value investigation; 2) information provided by the petitioner, Westinghouse; and 3) information supplied by the U.S. Customs Service.

Commerce scheduled a hearing on the revised preliminary results for May 8, 1984, again at Ansaldo's request. Prior to the hearing, Ansaldo submitted documents which, for the first time, provided the contract and specifications for the 1979 BPA II transformer sale. At the hearing Ansaldo accepted some of Commerce's margin calculations while objecting to others and requesting certain additional adjustments.

After considering Ansaldo's objections and comments, the ITA consulted a technical expert on the BPA II unit and the Italian home market unit selected for comparison on the best information available analysis. The technical expert confirmed that data obtained directly from the Bonneville Power Administration substantially corroborated the information submitted to Commerce by Westinghouse in its March 24, 1983 best information submission.

In the final results of administrative review of *Large Power Transformers from Italy*, 49 Fed.Reg. 31313 (August 6, 1984), the ITA declined to make several of the adjustments proposed by both Ansaldo and Westinghouse but submitted after publication of the revised preliminary results. Ul-

timately the U.S. Customs Service was instructed to assess dumping duties and require a cash deposit of estimated antidumping duties, at the rate specified by Commerce[2], on entries of large power transformers manufactured by Ansaldo. In defending its use of the best information available, the agency stated, at Comment 1:

The statute and regulations provide for the use of best information otherwise available in the context of investigations and section 751 reviews. We must resort to use of best information otherwise available when a party refuses or is unable to supply the Department with adequate information in a timely manner. We agree with Italtrafo that the Department is not required to rely exclusively on information supplied by the petitioner; in fact, we did not rely solely on information provided by Westinghouse. Here, we used certain information provided by the Treasury Department during the fair value investigation in this case and other information provided by the petitioner and the Customs Service. We did not use new information submitted by Italtrafo after publication of the revised preliminary results. Our refusal to use Italtrafo's information is based on Italtrafo's failure to submit adequate information in a timely manner in this review. The fact that the Department's regulations do not specify absolute time limits for submission of information does not nullify the Department's authority to refuse to use selected new information submitted after publication of preliminary results of our review. Clearly the Department, which must make a determination on the administrative record, must, at some time prior to a final determination, establish a point at which information submitted by parties can no longer be considered for purposes of reaching that final determination. Otherwise, we could not fully and properly take into account all the information submitted, or ensure a reasonable

---

**2.** Commerce determined the BPA I unit and the two units sold in Puerto Rico had been sold at less than fair value by a margin of 9 percent, and the BPA II unit had been sold at less than fair value by a margin of 92.47 percent.

opportunity to comment by all interested parties. Parties could effectively delay and frustrate the review process by repeated, untimely piecemeal submissions.

Further, the Department must be able to use the best information otherwise available when a respondent chooses to provide only selected new information at a time so late in the review process that its consideration would cause serious delay and expense to the Department and interested parties. Despite repeated requests, Italtrafo did not furnish the requested information until one week before the hearing, and then furnished only selected new information to supplement the Department's best information.

Accordingly, the Department has properly declined to take such information into account. Specifically, the Department has not considered new information submitted concerning physical characteristics of the transformers, testing, supply of oil, escalation payments, shipment dates, warranties, payment schedules, and packing expenses.

It is from this determination and agency record that plaintiff presently moves for judgment under Rule 56.1.

Plaintiff has challenged the Commerce determination of the dumping margin with respect to the BPA II transformer sale covered by the third review period. Ansaldo attacks the final results of administrative review on four bases: 1) Commerce erred when it determined Ansaldo and its principal home-market customer (ENEL) were unrelated; 2) Commerce's calculation of foreign market value by reference to an Ansaldo sale to ENEL was erroneous as a matter of law and unsupported by substantial evidence on the record; 3) Commerce acted arbitrarily and capriciously, and not in accordance with law, when it rejected information submitted by Ansaldo after publication of the preliminary determination; and 4) the refusal of Commerce to verify the information submitted by Ansaldo was incorrect as a matter of law.[3]

Defendant and intervenor, Westinghouse, oppose plaintiff's motion on several grounds. Defendant maintains Ansaldo refused to produce information in a timely manner and the ITA thus properly refused to consider plaintiff's submissions after publication of the revised preliminary results. Consequently, defendant argues, the ITA acted in accordance with law in reaching its determination of final results on the basis of the best information available. Westinghouse augments defendant's position and argues further that home market sales to ENEL were properly used in determining the foreign market value for Ansaldo transformers.

As framed by plaintiff, the principal issue presented by this review is the question of whether related party sales in the home-market should be used in determining foreign market value in an administrative antidumping proceeding. While this premise is not determinative in the outcome of this case, its importance merits elucidation, if not resolution, in the present analysis.

Although certain conclusions can be drawn from the record of this proceeding, it is significant that, at this late date, the exact nature of the relationship between Ansaldo (and its predecessor, Italtrafo) and ENEL, Ansaldo's principal home-market customer, remains unclear. Ansaldo, formerly Italtrafo, is controlled by Finmeccanica, S.p.A., which in turn is held by the Institute for Industrial Reconstruction (IRI). IRI is owned by the Italian Government. ENEL, Italtrafo's major purchaser, is the state electric utility and is administered by the Italian Ministry of Industry.

██ During the course of the underlying review, plaintiff submitted statements which, if accepted as fact, outline a pattern of common ownership and control between Italtrafo and ENEL. Both companies were financially controlled, under various entities, by the Italian Government. There

---

**3.** The "best information rule" is an explicit exception to the verification requirement. 19 U.S.C. § 1677e(a).

was no competitive bidding between Ansaldo and other home-market manufacturers for sales to ENEL. Future contracts were allocated, and prices were established, on a predetermined basis. Taken together, plaintiff's statements allege a related party relationship between Italtrafo and ENEL within the meaning of 19 CFR § 353.22(b) and section 771(13) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1677(13).

Under 19 CFR § 353.22(b), sales between related parties "ordinarily will not be used in the determination of foreign market value unless such sales are demonstrated to the satisfaction of the Secretary to be at prices comparable to those at which such or similar merchandise is sold to persons unrelated to the seller."

A dispute concerning whether to use related party home-market sales in determining foreign market value ordinarily arises in a different context. It is usually the domestic petitioner who objects to the use of such data in agency formulations. Related party home-market sales tend to be lower in price because related companies generally decrease prices to each other to the advantage of the principal entity. The present situation reflects the opposite scenario. Westinghouse seeks inclusion of the related party home-market sales data, alleging Ansaldo uses home-market sales at very high prices to subsidize exports to the United States at sharply lower prices. For its part, Ansaldo maintains its relationship with ENEL permitted Ansaldo to charge artificially high, nonmarket prices to ENEL in order to permit the government of Italy, through its various divisions and holdings, to implement national and regional social policies.[4]

The respective parties have advanced several arguments involving the use of related party home-market sales data in the antidumping scheme. However, a definitive resolution of this issue need not be reached in the case at bar. Instead, the Court is compelled to resolve this matter on a more fundamental basis, the grounds for which are clearly evident upon review of the administrative record.

Under 19 U.S.C. § 1673, if the price for goods in the United States is less than the foreign market value of the goods, the difference between the two is the margin of dumping in the United States and antidumping duties must be paid to offset it. The determination of foreign market value begins with price in the producer's home market. 19 U.S.C. § 1677b(a)(1)(A). If home-market sales are inadequate for comparison, the foreign market value can be determined using either sales to third countries other than the United States (19 U.S.C. § 1677b(a)(1)(B)) or a non-price method known as constructed value, in which the value is determined from the costs of materials, the cost of production, general expenses and profit. 19 U.S.C. § 1677b(a)(2) and (e). *Zenith Corp. v. United States*, 9 CIT ——, 606 F.Supp. 695 (1985).

■ The U.S. Department of Commerce, specifically the ITA, is charged, under the Trade Agreements Act of 1979, with the administration of the antidumping laws. In conducting reviews under section 751(a), the ITA requests pertinent information from those who will be affected by the results of the review. In order to comply with the requirements of the statute, the ITA provides participants a specified period in which to provide the information requested. After this period expires, the ITA must refuse to consider untimely submitted information and instead rely on the best information available. *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556 (1984); *UST, Inc. v. United States*, 10 CIT ——, Slip Op. 85–78 (July 31, 1985).

19 U.S.C. § 1677e(b) provides:

(b) **Determinations to be made on best information available.** In making their determinations under this title [19 USC §§ 1671 et seq.], the administering authority and the Commission shall, whenever a party or any other person refuses

---

**4.** For example, Ansaldo claims ENEL was willing to pay a premium for transformers manufactured in southern Italy in order to alleviate regional unemployment.

or is unable to produce information requested in a timely manner and in the form required, or otherwise significantly impedes an investigation, use the best information otherwise available.

■ Review of the administrative record reveals a consistent pattern of unresponsive, insufficient, and untimely submissions by Ansaldo to repeated attempts by Commerce to elicit information pertinent to the underlying reviews. Based on the evidence before the Court, Ansaldo's failure to furnish the information requested completely justified the Commerce Department's use of the best information available under 19 U.S.C. § 1677e(b). Accordingly, for the reasons set forth below, the Court finds for the defendant and affirms the results of the administrative review.

As previously noted, plaintiff has limited its challenge to the dumping margin determination pertaining to the 1979 BPA II transformer sale. Commerce first learned of the BPA II sale from Westinghouse in February of 1980. Thereafter, beginning on August 13, 1980, Commerce requested, on three separate occasions, information pertinent to the BPA II and any other sales during the relevant periods. In response to these requests, Ansaldo asserted it made no home-market sales to unrelated parties. Ansaldo did submit (untimely) information on the 1973 BPA I sale and certain third country sales in 1973–74. However, neither home-market sales data nor price information of any kind was provided in these submissions. Finally, on May 1, 1984, Ansaldo provided information intended to supplement Commerce's best information available determination on the BPA II sale. As the revised preliminary results of administrative review had already been published (March 16, 1984), Commerce rejected Ansaldo's submission as untimely and instead relied on the data accumulated on the basis of best information available.

■ The administrative record indicates Ansaldo was either conspicuously uncooperative with Commerce during the course of the underlying reviews or laboring under severe misconceptions as to the admin-istrative procedure involved in the administration of U.S. antidumping law. Initially, the Court observes that neither the Treasury Department nor Commerce ever received a response from Ansaldo by the requested date. This fact, in and of itself, provides sufficient basis to sustain Commerce's use of the best information available. Section 751 reviews are conducted and must be completed within specific timeframes. The procedures involved in these reviews make it imperative the requested information be submitted within a period that allows Commerce sufficient time for adequate analysis and comment while still meeting statutory deadlines. As in the present case, when the information requested is not timely provided, Commerce has no choice but to proceed with its review and reach its determinations using the best information available. *UST, Inc.* (supra).

■ Of equal concern to the Court is plaintiff's propensity to draw conclusions of both factual and legal significance on matters properly within Commerce's domain. The administrative record discloses several instances in which Ansaldo chose not to submit the information requested because Ansaldo had concluded such information could not serve as a basis for Commerce's administrative review. It was Ansaldo that concluded all its home-market customers were related parties and thus refused to submit home-market sales data. It was Ansaldo that concluded the administrative review should proceed on the basis of third country sales. It was Ansaldo that concluded the only comparable transformer sales were of units with a rating of 100 MVA or higher when Commerce requested information on units with a rating of 10 MVA or higher. Finally, it was Ansaldo that concluded furnishing home-market and U.S. sales price data imposed an "unreasonable and unnecessary burden on the company." Such conclusions, reached unilaterally with no foundation in statute or administrative practice, are inherently flawed. It is Commerce, not the respondent, that determines what information is to be provided for an administrative review.

The net effect of Ansaldo's failure to submit the requested information, based on its own conclusory assertions, was to preclude Commerce's analysis and consideration of the merits of Ansaldo's arguments. Ansaldo provided no information upon which Commerce could have determined the U.S. price of the BPA II transformer. Similarly, the ITA had insufficient information to determine the foreign market value of BPA II, which necessarily begins with the price in the producer's home market. Although Ansaldo did provide third country sales data for the review period covering the BPA I sale and the two sales in Puerto Rico, the data submitted for the period covering the BPA II sale was inadequate, and Commerce was unable to determine the foreign market value using third country sales methodology. Additionally, Ansaldo provided no independent evidence of the exact nature of its relationship with its home-market customers. In the event Commerce had accepted the argument that Ansaldo was "related" to its home-market customers, Ansaldo provided no home-market sales data which Commerce could have used in an evaluation of price comparability of sales to related and unrelated parties. These facts indicate a failure, on Ansaldo's part, "to produce information requested in a timely manner and in the form required", and under the circumstances Commerce's resort to the best information available was entirely justified. 19 U.S.C. § 1677e(b).

 In so ruling, the Court seeks to encourage the cooperation of participants to the reviews conducted at the administrative level. The relationship between administrative participants and the agency involved ought not be adversarial in nature. This is particularly true where, as in this case, the role of the agency is administrative rather than quasi-judicial. Indeed, as the result in this case demonstrates, the information sought by the agency must be provided in order to assure its full consideration before both the agency and the reviewing court. The Court is aware that information sought in section 751 reviews may have a significance wholly independent from its proffered use, and respondents may be reluctant to share material they deem irrelevant to such reviews. However, the consequence of failing to provide adequate and timely information is to leave Commerce with no alternative but to proceed with its review relying upon the best information available. Simply stated, to ensure the agency's full consideration of their position and rights under the antidumping law, respondents must comply with procedural guidelines and thereby afford themselves the opportunity to respond and participate in the review in a meaningful manner.

Accordingly, the Court finds the Commerce determination to conduct the review using the best information available to be fully supported by substantial evidence on the record and otherwise in accordance with law. The final results of the administrative review involving *Large Power Transformers from Italy*, (49 Fed.Reg. 31313, August 6, 1984) are therefore affirmed, and this action is hereby dismissed. Judgment will be so entered.